UNITED STATES v. SOTO. See Case No. 16,-156.

## Case No. 16,358.
### UNITED STATES v. SOUDERS.
[2 Abb. U. S. 456.] [1]

District Court, D. New Jersey. April Term, 1871.

ELECTIONS—PREVENTING VOTING—CONSTITUTIONAL LAW—ELECTION RETURNS, HOW CERTIFIED.

1. On indictment, under section 19 of the act to enforce the right of citizens to vote, &c., approved May 31, 1870 (16 Stat. 144), for "unlawfully preventing certain qualified voters from freely exercising the right of suffrage;" where the proof was, that the defendant, with others, attacked a number of voters, waiting in line for their turn to cast their ballots, and expelled them from the room; and that said voters afterwards returned and voted: Held, that the defendant committed the offense which congress

1 [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

meant to define and punish in the clause of the section under which the indictment was drawn.

2. The prevention took place, and the offense was complete, by the expulsion of the voters from the polls, although the prosecutors afterwards voted.

3. The words "exercising the right of suffrage" in section 19 of the act of May 31, 1870, may be held to mean "voting," without bringing that section in conflict with the provisions of section 4 of the act,—provided that the penalties prescribed in section 19 be understood to apply to offenses committed at elections for members of congress, and those in section 4 to state, county, and municipal elections.

4. Query, whether under the fifteenth amendment to the constitution of the United States, congress has power to pass any law to operate upon private individuals?

5. A copy of a return of an election in a township, filed with the clerk of the county, accompanied by the certificate of the clerk of the county, that it was a full and correct return of such election, as filed in his office,—sent to the office of the secretary of state, is not made and certified in the manner, and does not come from the source required by the election law of New Jersey, to constitute it an official paper.

Motion for new trial, after conviction on an indictment.

A. Browning and B. Williamson, for the motion.

A. Q. Keasbey, Dist. Atty., in opposition.

NIXON, District Judge. The defendant in this case has been indicted, and upon trial convicted, of "unlawfully preventing certain legal voters from freely exercising the right of suffrage" at an election for a member of congress, held on the eighth day of November last, in the township of Newton and county of Camden. [Case unreported.] The indictment was framed under section 19 of the act, entitled "An act to enforce the right of citizens of the United States to vote in the several states and for other purposes," approved May 31, 1870.

It may be assumed, in view of the verdict of the jury, that the government proved, at the trial, that on that day,—fixed by law for the election of a representative in congress, and the several state and county officers,—the polls were regularly opened at seven o'clock, a. m.; that the election was conducted by certain officers, claiming to act under the authority of the township; that during the progress of the election, at about half-past ten o'clock in the morning, whilst the room in which the election was held was well filled with colored voters, waiting for the opportunity of casting their ballots, a violent attack was made upon them by a company of white men, driving them forcibly from the room into the street, and closing, or attempting to close the door against them; that amongst the legal voters thus rejected, were John Ray, Henry W. Sizer, Lorenzo Wilson, Wm. H. Newsome, and Moses Wilcox; that these men, with others driven out, almost immediately rallied, and with the aid of their friends, regained admittance to the room, and, in turn,

drove out the white men; and that all of them subsequently voted. The jury has also found, as a question of fact, that the defendant, Francis Souders, was engaged in this outrage of expelling the colored voters from the room, and thus preventing them from freely exercising the right of suffrage.

It further appears, that after the morning disturbance was quelled, the voting was resumed and continued without any serious interruption, until about six o'clock in the afternoon; that eight hundred and sixteen ballots were deposited; and that then another crowd of white men took possession of the polls, seized the ballot box, broke it in pieces, and scattered the ballots upon the floor and in the street.

Upon submitting this case to the jury, at the trial, I reserved two legal questions for consideration afterwards,—more in deference to the strongly expressed convictions of the able counsel for the defense, than because I entertained any serious doubt as to their correct import and meaning. Since then I have examined the briefs submitted by the counsel for the government and of the defendant, elaborately discussing these questions, and have given to them that careful attention which their importance, as bearing upon the conviction of the defendant, seemed to require.

The first question involves the true construction of the clause of section 19 of the act entitled "An act to enforce the right of citizens-of-the United States-to-vote in-the-several states of this Union, and for other purposes," under which the indictment against this defendant was drawn; and the second, the legal effect upon this case of the certificate of election, filed in the office of the secretary of state, by certain persons, claiming to make the return of the election in the township of Newton, in the county of Camden, on November 8, 1870.

I. The charge against the defendant in substance is, that at an election for a representative in the congress of the United States, held as aforesaid, he unlawfully prevented certain qualified voters from freely exercising the right of suffrage, by force, threats, menaces, and intimidation. The proof is, that at said election, the defendant, in company with others, in the room where the polls were opened, made an attack upon a line of voters, waiting for the opportunity of casting their ballots for a member of congress, and drove them from the room with violence, under the pretext that certain other voters not in the line were excluded from the polls, and attempted to fasten the doors against their re-admission.

It is insisted, on the part of the defendant, that this is not the offense which congress meant to define in the clause of section 19, under which the indictment was framed; that preventing a voter from freely exercising the right of suffrage is not preventing him from voting; that the one is a mental restraint, and the other a direct physical interference; and

that the design of congress, in using these words in this section, was to protect men in voting as they wished to vote, rather than to secure to them the opportunity of voting. It is further maintained, that, even if it be conceded that one of the meanings of the expression, "preventing a voter from freely exercising the right of suffrage," is "preventing him from voting;" yet the facts of the case do not prove a prevention, but a hindrance; that to prevent, is altogether to deprive him of the opportunity to vote, while to hinder is only to delay him temporarily in the exercise of the privilege; and that, as all the prosecutors afterwards voted, the offense defined in section 19 of the statute was not committed.

The argument is, that in the first place, the proper definition of the words used will not admit of the construction claimed by the government; and that, in the next place, all the sections of the statute must be so construed, as to render them operative, consistent, and harmonious with each other; that the construction given to section 19 by the government brings it in direct conflict with the provisions of section 4 of the act; that one penalty is described in section 4 for "preventing, hindering, or obstructing a qualified voter in voting;" and that a different and more severe penalty is affixed in section 19, for "unlawfully preventing him from freely exercising the right of suffrage;" and hence, that it is necessary to assume, in order to harmonize the provisions of these two sections, that different offenses were in the mind of congress when the law, as a whole, was enacted.

1. Our first inquiry will be, whether a proper definition of the words used in the section fairly admits of the meaning insisted upon by the counsel for the government?

There are well settled rules in the construction of statutes. The object of all inquiry is to get at the intention of the legislature in passing the law; and the sole duty of the court is to grant to that intention, when ascertained, its full force and effect. We first consider the language employed, giving to words and sentences their obvious import and signification; having regard more to their general and popular use than to etymological or grammatical refinements. If any doubt remains, we then look at the context; at the subject matter; look to the effects and consequences of this or that interpretation; to the reason and spirit of the law itself; expounding it in the light of the mischief of the old law, or want of law; and the remedy which the legislature has attempted to provide.

Where the statute is penal it must have a strict construction; for the law is tender as to the rights of individuals, and courts wisely shrink from the exercise of the power of punishment, except upon conviction in those cases where the legislature has clearly defined the offense and imposed the duty. But we must not err in a too liberal application of the rule. As was well said by Chief Jus-

tice Marshall, in U. S. v. Wiltberger, 5 Wheat. [18 U. S.] 95: "Though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases which those words, in their ordinary acceptation, or in that sense in which the legislature has obviously used them, would comprehend. The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one, indeed, which would justify a court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest."

Holding these familiar principles in mind, let us consider the clause of the section the meaning of which we are trying to ascertain. The words are, "that if at any election for representative, &c., any person shall by force, threat, menace, intimidation, or otherwise, unlawfully prevent any qualified voter from freely exercising the right of suffrage," &c.

What do these words mean? It would seem that there ought not to be any difficulty in arriving at their signification, if we give to them their obvious and usual import. When a man is spoken of as exercising a right, it is commonly understood that he is doing something. When a voter casts his ballot into the box, do we not say that he is exercising the right of suffrage? Can any words be used that better define the act of voting? And when he exercises this right freely, does he not do it according to his pleasure, without any constraint either upon his mind or his body? His will must be uncontrolled, and his physical opportunity for doing the act must not be interfered with. Any control over the one, or interference with the other, encroaches upon his freedom of action, and produces the mischief which the words of the statute were designed to guard against and cure. And what is it to prevent a voter from exercising this right?

It is to put such a restraint upon his volition, or his body, that he cannot perform the act; producing, by threats or otherwise, such apprehension of personal loss or injury, as to induce him not to vote, or to vote contrary to his wishes, being a restraint upon his will; and intervening between him and the ballot box, so as to render it physically impossible for him to cast his vote, being the restraint upon his body. If this was what the statute forbid, the words used might afford some color for the construction asked for by the counsel for the defendant. But it forbids more than this. It prescribes penalties against those who unlawfully prevent voters from freely exercising the right of suffrage. It not only guards the voter against being stopped in the act, but it shields him against all sorts of duress, mental or bodily, while in the performance of the act. Even if it be true that a man is only prevented from voting when he is hindered altogether from exercising the right of suffrage, it is also true that he is prevented from freely exercising such right, when, in its exercise, any kind of constraint is placed upon him by force, threat, intimidation, or otherwise.

I am of opinion, therefore, that, looking at the words of the section in their obvious usual signification, and without any reference to the influence and control which other sections of the statute ought to have in the consideration of its construction, the indictment properly describes the offense which congress meant to define and punish, and the proof of the facts in the case sustains all the material allegations of the first and third counts of the indictment.

2. But it is insisted that such a construction of section 19 will bring it in conflict with section 4; that if we hold that the identical offense is described in these two sections, we subject congress to the imputation of passing an act prescribing different penalties in different sections, for the same misdemeanor; and that it is the duty of the court, under such circumstances, to find some other interpretation of the clause in section 9, which will bring the two into harmony, and cause them both to stand.

The court recognizes this authority and duty when the occasion arises for its exercise, but finds no occasion here. To create this antagonism it is necessary to assume that the phraseology of section 4 is broad enough to include congressional elections as well as state, county, and municipal. It does not do so in terms; and I am not willing to assert that if that section stood alone, the language used is not capable of such construction. But it does not stand alone, and it must be construed in connection with other sections of the act; and if the absurd consequences suggested by the counsel for the defendant are to follow the assumption that section 4, as well as section 19, was designed to apply to federal elections, is it not more consonant to reason and the principles of right interpretation, that we should limit the provisions of the one to state, county, and municipal elections, and of the other to the election of members of congress, than to wrest the words from their natural and obvious meaning, in order to create different and distinct offenses?

And this brings us to the inquiry, what offenses did congress mean to guard against and punish in these two sections of the act? I must acknowledge that the question is not free from embarrassment, if we consider the words only which they have used to express their object. The whole law indicates a want of precision and harmony in the use of terms that suggests either haste, or the

work of more than one mind, in its preparation.

In construing a statute, it is one of the fundamental rules to ascertain the intention of the law maker. Where the words used do not clearly disclose this intention, it is proper to consider what was said or done by the law-making power, while the subject matter was under discussion, in order to arrive at their meaning. Looking carefully into the mischief avowedly intended to be remedied by law, and into the history of the legislation preceding and accompanying its enactment, can there be any doubt but that its different sections were the work of many minds; that the law gradually grew from a single proposition, including only one object, into a complex one, embracing several; that the first thirteen sections were prepared to enforce the fifteenth amendment; that the next five sections were inserted to more effectually provide for carrying out the fourteenth amendment, and that the nineteenth and subsequent sections were afterwards added to accomplish another object, to wit: to preserve the purity and freedom of elections for members of congress?

Bills were pending and under discussion at the same time in the senate and house of representatives, with different provisions, but relating to the same subject matter, and having the same end in view. The title of these bills and the provisions of the several sections show that the primary design in each case was simply to provide the appropriate legislation deemed necessary to enforce the fifteenth amendment. The house bill, as passed on May 16 and sent to the senate on the 17th, was confined to this object. When it reached that body the senate bill No. 810, entitled "An act to enforce the fifteenth amendment of the constitution" was under discussion. This, substantially, consisted of the first thirteen sections of the law, as subsequently passed, and a motion had just been made to enlarge the purposes of the bill by adding to it two other bills, then pending in the senate, to enforce the fourteenth amendment, and which embraced the sections from the fourteenth to the eighteenth inclusive of the present law. The senate amended the house bill by striking out all after the enacting clause, and substituting their original bill with the proposed amendments; and after a few days' discussion the object and scope of the act were still further enlarged by annexing the 19th and 20th sections, for the expressed purpose of punishing frauds committed in the election of members of congress. These subsequent sections had been embodied in house bill No. 477, entitled "An act to prevent and punish election frauds," and which had been reported to the house from the committee on elections, and was then pending before that body as an entirely distinct measure. The bill thus amended passed the senate, and the remaining sections were added to it by the committee of conference on the disagreeing votes of the two houses.

Not much homogeneousness of language or expression should be looked for in an act thus made up, and little force can be given to the argument, that because different words and forms of expression have been used in different sections, it should be assumed that there was a design in the mind of the law-making power to express and define different offenses.

This reference to the origin of the law reveals the fact that the manifest object, in section 14, was to enforce the provisions of article 15 of the amendment to the constitution, and in section 19 to conserve the freedom and purity of elections for members of the house of representatives.

In legislating to enforce the provisions of the fifteenth amendment, it was conceded that congress might prescribe penalties against national or state officers, for interfering with the free exercise of the right of suffrage, and against all persons claiming to act under color of some state law or constitution; and the question at once arose, whether the constitutional power existed in congress to pass any law which acted upon private individuals. That amendment, it was alleged, related only to acts done by the United States or any state, to abridge or deny the right to vote on account of race, color, or previous condition of servitude. It had no reference to individuals acting as such, except so far as they pretended to be acting under the authority of existing law, state or national. It is not necessary for me to express any opinion upon that question here and now; but I allude to it in order to say that, in the debate upon section 4, it seemed to be admitted, both by the friends and opponents of the measure, that no indictment could be sustained under that section, against any one, unless the prevention of voting, or the denial of the right to vote, was done under the color or pretense of some state law or regulation. The act was amended by adding sections 19 and 20, expressly to cover the case of private individuals, who were corrupting the fountain of political life and social order by fraud, bribery, intimidation, force, or other unlawful means, and, anticipating the objection raised by others against the powers of congress to legislate in the matter of state elections, these sections were limited to offenses committed at an election for members of congress.

I am, therefore, of opinion that the words "unlawfully preventing a voter from freely exercising the right of suffrage," may be construed to mean "to unlawfully prevent him from voting," without bringing section 19 in conflict with section 4, and that it is not necessary to find some other interpretation to harmonize the provisions of these sections of the act.

It is further insisted, that to constitute the offense created by the clause of section 19 under consideration, the voter must be altogether frustrated in his efforts to cast his ballot; that the whole day is covered, so far as the meaning of the word prevention is concerned; and that, as these prosecutors found the opportunity to vote after their ejection, although for a time hindered, the offense was not committed.

It seems to me, as I have already intimated, that such a construction of the statute is too narrow, and that it defeats the purpose which congress had in view in enacting it. This purpose was to protect men in the discharge of their most sacred political privilege. That would be a slight protection, indeed, which allows bullies and rowdies to surround the ballot box from the opening to the close of the polls, keeping off all legal voters by threats, intimidation, or force; and then to hold that the offense is not committed, if by chance the hindered voters should avail themselves of a casual opportunity to slip in their ballots when the backs of these vigilant sentinels were turned. And yet this result follows the interpretation asked for.

But the argument here, of the counsel of the defendant, loses all its force when we call to mind that "exercising the right of suffrage," in the statute, is qualified by the word "freely," which, in his reasoning, he seems to have overlooked.

The proposition is, that we shall not prevent a voter from freely exercising the right of suffrage.

It may be admitted that prevention, in its strict signification, includes more than hindrance, and that it involves the idea of total exclusion from the right of voting. But is no force to be given to the word "freely?"

In view of the fact that these five men afterward voted, the counsel for the defendant asked whether they could truthfully answer "yes" to the inquiry, "Were you prevented from voting on the 8th of November last?" and insisted that their correct response would be, "No; we were hindered—not prevented."

But suppose the inquiry had been, "Were you prevented from freely exercising the right of suffrage?" they would answer, "Yes, we were hindered from voting by being knocked down, shot, forced out of doors, and having the doors closed against us. We were prevented from voting freely. We voted under great difficulties."

It is hardly necessary to multiply words upon this point. It is in proof that these five men stood waiting in line before the ballot box with ballots in their hands, intending to vote for certain individuals upon a certain ticket, which they wished to deposit; that while thus standing prepared to exercise and intent upon exercising their right of suffrage, Francis Souder, with others, drove them from the room and shut the doors against them. How can it be said that they were not prevented from exercising their right freely?

II. The only remaining question which we have to consider, is the legal effect upon this case of a paper produced by the government from the office of the secretary of state, and purporting to be a certificate of election filed by certain persons claiming to make the return of the election held in the township of Newton on November 8, last.

The reasoning of the counsel for the defendant upon this point, as it appears to the court, is founded upon a misapprehension of the allegations of the indictment.

The argument is, that the indictment charges that the offense was committed at an election held in the township of Newton, on November 8 last, by Alexander B. Mahan, Samuel P. Atkinson, and Herman Klusterman, judges; that the statute requires the judges holding the election to file a certificate of the results, in the office of the secretary of state, certifying the number of votes polled and received by each candidate, and the names of the persons voted for, and that such paper shall be an official paper; that to sustain the allegation in the indictment, the prosecution produced this certificate, which is in fact signed by other parties, and therefore does not prove, but directly contradicts the allegation.

The reply we have to make to the argument is, that there is no such allegation in the indictment, nor was any such material or proper.

The charge was, that a stated election for a representative in the congress of the United States, and for certain state officers, was duly held on that day at the township of Newton, in the county of Camden.

The facts, therefore, to be proved were, not that Alexander B. Mahan, Samuel P. Atkinson, and Herman Klusterman, were the judges who conducted the election,—but that a stated election was then and there held; that it was conducted by persons claiming to act under the authority of public law, and that it was held for the purpose of electing a member of congress.

And were not these facts proven? A large number of witnesses testified to them. No one raised a doubt by questioning them. The defense fully showed them by producing the poll book required to be kept by section 40 of the state election law (Nix. Dig. 263), having the proper heading, and containing a record of the names of the persons whose votes were received, and the order of their reception, and offering the clerk and two of the judges of election as witnesses, by whom the facts of election and the correctness of the poll book were established.

But it seems to be admitted that these material facts were proved. It is insisted, however, that a copy of a certificate was produced from the office of the secretary of state, which is invested by the statute with

the character of an official paper, and which contradicted, and therefore invalidated or nullified the verbal proof.

There are short and conclusive answers to this:

1. The paper thus produced was not made or certified in the manner, and did not come from the source required by the statute to constitute it an official paper. It appears, upon inspection, to have been the copy of a return filed with the clerk of the county of Camden, with the certificate of that clerk appended that it was a full and correct return of the election in the township of Newton, as filed in his office. It did not come to the secretary of state, either from the board of election of the township, or from the board of county canvassers.

2. But admit that it has the prerequisites necessary to make it an official paper. Then it is a record, or it is not. If a record, and incapable of contradiction by verbal evidence, as claimed by defendant's counsel, all the facts which it contains must be accepted as true. It shows that there was an election in the township of Newton, in the county of Camden, on November 8 last, and that such election was for a representative in the congress of the United States, which are the material facts to be established; and all the verbal testimony in the cause, to the effect that some other judges held the election, must be regarded as untrue; exhibiting the depravity of the character of the witnesses, or the fallibility of their memory. But if it is not a record, and may be contradicted by other proof, then the verbal evidence offered is abundant to prove these necessary facts in the case, and the verdict was right.

Thus, after a careful survey of the law and the evidence, the court finds no sufficient reason to be dissatisfied with the result at which a patient and intelligent jury arrived, and the motion for a new trial is denied.

Motion denied.